# Illinois Official Reports

## Appellate Court

<div style="border">

### *Village of Posen, Illinois v. Illinois Fraternal Order of Police Labor Council*, 2014 IL App (1st) 133329

</div>

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF POSEN, ILLINOIS, Plaintiff-Appellant, v. ILLINOIS FRATERNAL ORDER OF POLICE LABOR COUNCIL, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-13-3329 |
| Filed<br>Rehearing denied | August 11, 2014<br>September 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld the trial court's confirmation of an arbitration award entered for defendant union as the representative of a police officer in a grievance procedure arising from the officer's termination for failing to return the checks he received from plaintiff village's workers' compensation insurer for the injuries he suffered in a fall at the same time he was receiving his regular paychecks, notwithstanding the village's contentions that the arbitrator improperly required the village to prove its allegations by clear and convincing evidence, rather than the preponderance of the evidence, that the award violated public policy, that a pretermination hearing should have been held and that a remand should have been ordered for the entry of a setoff, since the arbitrator's decision stated that the evidence "preponderates" in favor of the policeman, the village failed to show how the officer's reinstatement would violate any public policy, the absence of a pretermination hearing had no impact on the award, and the award did not include a setoff, especially when the village did not raise the issue before the arbitrator and no setoff was mentioned by the arbitrator. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-37545; the Hon. Moshe Jacobius, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas F. McGuire, of Thomas F. McGuire & Associates, Ltd., of Long Grove, for appellant. |
| | Jeffery Burke, of Illinois Fraternal Order of Police Labor Council, of Western Springs, for appellee. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion. <br> Justice Cunningham concurred in the judgment and opinion. <br> Justice Delort specially concurred, with opinion. |

## OPINION

¶ 1    Plaintiff, the Village of Posen (Village), appeals from an order of the circuit court that denied plaintiff's motion to vacate an arbitration award and confirmed the award entered in favor of defendant, the Illinois Fraternal Order of Police Labor Council (Union), which had represented Kevin Hammond in a grievance procedure after Hammond was terminated from the Village police department. On appeal, the Village contends the circuit court improperly struck allegations in its complaint that alleged that Hammond was not covered by the collective bargaining agreement and therefore the arbitrator did not have jurisdiction. The Village also challenges the underlying arbitration award, contending that: (1) the arbitrator improperly required that the Village prove the allegations by clear and convincing evidence, rather than by a preponderance of the evidence; (2) the arbitration award violates public policy; and (3) the arbitrator improperly required the Village to hold a pretermination hearing. Lastly, the Village contends that if the award is upheld, the matter should be remanded to the arbitrator to determine a setoff. We affirm the judgment of the circuit court and decline to remand for a setoff.

¶ 2    The record reveals that the Union is the exclusive bargaining representative for police officers employed by the Village. Hammond began as a part-time Village police officer in July 2006 and became a full-time officer in May 2008. While returning to his squad car on February 11, 2011, Hammond slipped on some ice, causing him to fracture his knee and injure his arm. As a result of his injuries, Hammond was off work for an extended period and was eventually released to return to work in August 2011.

¶ 3    Pursuant to the Public Employee Disability Act (Act) (5 ILCS 345/1 (West 2010)), Hammond received 100% of his salary beginning on the date of his injury. Additionally, workers' compensation provided a benefit of two-thirds of an employee's regular income. The dispute between the Union and the Village arose because, for a period of time, Hammond received his salary and workers' compensation checks simultaneously, contrary to

the Village's general practice of the Village receiving and retaining the workers' compensation checks from the insurance carrier. The Village eventually learned of Hammond's double payments, and on June 13, 2011, Hammond was terminated because he "accepted and endorsed checks from both the Village of Posen and [the] workers' compensation carrier for the same period of missed work" and failed to return those funds to the Village.[1] The Village maintained that Hammond violated three of the Posen Police Department Rules of Conduct (Rules of Conduct). In part, the Village asserted that Hammond engaged in unbecoming conduct, defined as "any action or occurrence which discredits or brings the Department into disgrace, disrespect[,] or reflects badly upon an individual member(s) of the Department" and "any activity that impairs or disrupts the operation or efficiency of the Department or *** individual member." Additionally, Hammond was alleged to have violated a rule concerning immoral conduct, which states that officers "will not participate in any incident or activity that involves questionable or immoral behavior that could impair their ability to perform as a law enforcement officer or causes the Department to be embarrassed, disgraced[,] or discredited." The Rules of Conduct further provided that a violation of any of the rules "will be sufficient cause for counseling, reprimand, suspension[,] or dismissal" of any member of the police department.

¶ 4    After he was terminated, the Union filed a grievance on Hammond's behalf pursuant to the collective bargaining agreement between the Village and the Union. In part, the agreement provided that "[n]o employee covered by the terms of this Agreement shall be suspended, relieved from duty[,] or disciplined in any manner without just cause." In a section titled "Management Rights," the agreement further provided:

> "Except as specifically limited by the express provisions of this Agreement, the Village retains all traditional rights to manage and direct the affairs of the Village in all of its various aspects and to manage and direct its employees, including but not limited to the following: *** discipline, suspend[,] and discharge employees for just cause (probationary employees without cause) ***."

¶ 5    Submitting the grievance in writing to the chief of police was the first step in a three-step grievance procedure for resolving disputes between the Village and an employee or the Union "regarding the application, meaning[,] or interpretation of this Agreement." The second step was to submit the grievance to the mayor. The third step of the procedure was arbitration, which would begin with the Village and Union selecting an arbitrator from a list of seven arbitrators from the Federal Mediation and Conciliation Service. The agreement provided that the decision and award of the arbitrator "shall be final and binding on the parties involved" and that the arbitrator "shall have no power to amend, modify, nullify, ignore, add to[,] or subtract from the provisions of this Agreement."

¶ 6    The Union's grievance in this matter alleged that the Village terminated Hammond without just cause in violation of the collective bargaining agreement. The grievance further stated that the desired remedy was to "reinstate the grievant to full employment, remove the

---

[1]Hammond received and deposited five or six workers' compensation checks. There appears to be some discrepancy as to the actual amount involved. The Village claimed that Hammond received and deposited approximately $4,836. Exhibits submitted to the arbitrator suggest the total was approximately $4,146.

notice of termination from the [grievant's] file, compensate the grievant for any lost wages and benefits, in part and in whole, make grievant whole."

¶ 7 Arbitration proceedings were held on February 7 and March 12, 2012. At the start of the proceedings, the arbitrator, counsel for the Union, and counsel for the Village had the following exchange:

"MR. ARBITRATOR: My assumption is that the issue before the Arbitrator is whether there was just cause for the termination of the grievant, Kevin Hammond, and if not, what is the appropriate remedy?

MR. BURKE [Counsel for the Union]: Yeah, we'll stipulate to that issue.

MR. ARBITRATOR: Is that correct?

MR. McGUIRE [Counsel for the Village]: Yes.

MR. ARBITRATOR: All right. *** [A]m I also correct in believing there are no procedural problems, no question of arbitrability?

MR. BURKE: We don't have any.

MR. McGUIRE: Same."

¶ 8 Additionally, the Village and the arbitrator disagreed about the amount of evidence needed to find that Hammond was terminated for just cause. While the Village asserted that the correct quantum of proof was preponderance of the evidence, the arbitrator stated that he would require clear and convincing evidence based on the nature of the charges. The arbitrator also stated that "where the accusations are such that they raise questions of moral turpitude, I require more than a mere preponderance."

¶ 9 In their opening statements, the Village contended that Hammond's actions constituted felony theft, while the Union asserted that the Village had rushed to judgment and lacked just cause to terminate him.

¶ 10 Mary Jo Wisniewski, a secretary for the Village who also handled workers' compensation claims, testified that after Hammond's injury, she initially believed his workers' compensation checks were being sent to the Village. However, around April 2011, she learned the checks were actually being sent to Hammond's home. She subsequently called the Village's workers' compensation insurance carrier, Berkley Risk Administrators Company (Berkley), and informed a claim manager that Hammond's checks should be sent to the Village because Hammond was already being paid 100% of his salary through payroll. Berkley had recently become the Village's workers' compensation insurance carrier. Reflecting about how the checks ended up at Hammond's home, Wisniewski stated "it could have been my fault. I don't know. *** [T]hey should have been informed when we switched over the insurance that in case of injuries, that we do pay 100[%], and all checks should be coming to us *** on both ends it was just a misunderstanding or an error."

¶ 11 On May 12, 2011, Mark Mendenhall, a Berkley claim manager, sent Hammond a letter that advised him that the Village had notified Berkley that it continued paying his salary while Berkley was paying workers' compensation benefits. The letter continued that additional benefits would be mailed to the Village and "[a]ny benefits you have received should be forwarded to the employer directly." Additionally, the letter stated that "[c]hecks that were mailed to you directly were stopped and resubmitted to your employer."

¶ 12 Karen Milewski, who was assigned as Hammond's case manager for his workers' compensation claim, testified that she was responsible for coordinating Hammond's

treatment and updating the claims adjuster and his employer on his treatment and recovery. Milewski denied that, prior to his termination, Hammond had ever told her that he was receiving an additional check on top of his salary. Milewski further testified that if someone were to inform her of a double payment, she would tell that person to either call an attorney or his claims adjuster as she does not handle that kind of issue and is "not [supposed] to get involved in that."

¶ 13 Sergeant Robert Quirk of the Village police department testified that he was asked to investigate after the Village learned of the double payments. During Sergeant Quirk's investigation, Hammond came to the Village twice–once to discuss his recovery and once to attend an interest arbitration–but did not approach Sergeant Quirk on either occasion to discuss the double payment issue, even though he had been notified by letter that he should return the money. When the chief of police eventually asked Sergeant Quirk for his opinion as to what should be done, Sergeant Quirk replied that he believed Hammond should be terminated because Hammond had committed theft, "his credibility was down the tubes," and he could not be trusted. When Sergeant Quirk and a detective served Hammond with termination papers on June 13, 2011, Hammond "said to [Sergeant Quirk] basically that his nurse was taking care of his problem."

¶ 14 Sergeant Quirk additionally testified that during his investigation, he did not ask Hammond for his side of the story. Sergeant Quirk was also not aware of a time before Hammond's termination when Hammond was notified of the allegations against him and provided an opportunity to respond. When asked why he never contacted Hammond about the double payments, Sergeant Quirk responded that he did not have to and was "waiting for him to man up and do the credible thing."

¶ 15 Chief of Police Ralph Jungles testified that by not coming forward, Hammond sent a message that he "just didn't care." Chief Jungles additionally stated he had to be able to trust his officers and know that they are honest, but as a result of the incident, Hammond "would no longer be an asset to the department."

¶ 16 Hammond testified that he started receiving checks from Berkley in late February or early March 2011. At first, Hammond put the checks aside, but eventually he and his wife deposited them because a memo on the checks indicated they would only be valid for a limited time. The checks were deposited into a special checking account that they used as savings. Sometime in mid to late March 2011, Hammond mentioned to Milewski that he was receiving the checks from Berkley. Hammond thought that perhaps the Berkley checks were to cover overtime that he normally worked but was not part of the deposits he was also receiving from the Village. According to Hammond, Milewski stated she would check and get back to him. Although Milewski did not ultimately follow up with him about the checks, the checks stopped within two or three weeks of their conversation. Hammond explained that he did not contact the Village about the checks because he thought he was supposed to contact Milewski, who had told him she was his point of contact for doctors' visits or insurance.

¶ 17 Hammond further testified that he read the letter from Mendenhall, the Berkley claim manager, to mean that he might owe money to Berkley, and as a result, he did not contact anyone at the Village about the letter. He did not send any money to Berkley because he did not know how much he owed. Hammond further explained that he did not contact the Village because at the time, he was worried about his therapy and medical issues that had arisen with

his wife and son. After he was terminated, Hammond received a letter from the Village indicating he would no longer receive benefits under the Act, his workers' compensation benefits would continue until the end of his treatment, and other benefits would be suspended until the $4,836.58 he took from the Village was repaid. This letter was the first calculation he received of how much the Village believed he was overpaid. Ultimately, the Village deducted the amount it believed it was owed from Hammond's final compensation.

¶ 18    At one point during the arbitration hearing, counsel for the Village asked Hammond how he was "surviving," which counsel explained as asking for "credibility." After the arbitrator stated he did not know why counsel was asking such a question, counsel rephrased and asked Hammond whether he had worked anywhere "for any type of salary" since he was released back to work. Hammond responded that he was paid to help a friend move some items.

¶ 19    At the beginning of its posthearing brief, the Village stated "[h]opefully, it is clear from the [collective bargaining agreement] in the case at hand that the Arbitrator has the authority to determine whether or not 'just cause' was/is present to discipline Grievant." The Village further contended that Hammond's actions were extremely serious. According to the Village, after receiving the letter from Berkley, Hammond had ample time to contact Berkley or the Village and chose not to do so.

¶ 20    In its posthearing brief, the Union contended that once it learned of the overpayments, the Village should have immediately advised Hammond and did not do so because the Village was building a case for his termination. The Union further stated that Hammond did not deny receiving the checks or depositing them into his bank account. However, the remainder of the Village's case "amounts to a request that the Arbitrator make a leap of faith" and accept the claim that Hammond violated Village rules by having checks mailed to his house and not knowing what to do with them, which was insufficient to meet the Village's burden.

¶ 21    On August 27, 2012, the arbitrator issued an award, finding that Hammond was not discharged for just cause. Discussing the proper quantum of proof, the arbitrator noted a "widespread recognition" that arbitration of just cause vests the arbitrator with discretion to select the required quantum of proof. The arbitrator found it "difficult to believe that the sophisticated parties who negotiated this contract *** did not foresee the likelihood that any experienced arbitrator would probably require more than a mere preponderance of the evidence in a case involving allegations of criminal activity." The arbitrator further stated that because a finding that an employee is a thief has particularly severe consequences, "a discharge for theft is distinguishable from other types of cases where a simple preponderance of the evidence will suffice."

¶ 22    Citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the arbitrator also found that the Village denied Hammond's right to a pretermination hearing. However, based on *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299 (1996) (*AFSCME II*), the arbitrator stated that it would be improper to reinstate Hammond for this violation without considering the merits. According to the arbitrator, the only issue was Hammond's state of mind–whether he knew he was receiving sums he was not entitled to and whether he intended to keep those sums. The arbitrator described the letter from Mendenhall as "not a model of clarity" and "open to interpretation," as it stated that benefits paid should be forwarded to the employer and that the checks mailed to him were stopped and resubmitted to the employer. Further, it was "more likely than not" that Hammond had a conversation "of some sort" with Milewski in

March 2011 about why he was receiving the workers' compensation checks, which was inconsistent with an intent to commit theft.

¶ 23    Overall, the arbitrator found:

"[Hammond] was not fired for being passive. He was not fired for being a fool. He was fired for being a thief. *** Because the offense underlying these charges turns on his state of mind, and because they made no effort to determine his state of mind, they left open an opportunity for him to offer an innocent explanation of his actions. He did so, and I believe the evidence preponderates in favor of his explanations. Given that, it necessarily follows that the Department cannot carry its burden–under any quantum of proof–of proving that [Hammond] intended to commit theft by depositing the checks from Berkley. In light of the outcome on the merits, there is no need to address the appropriate remedy for the due process violations."

¶ 24    Having found that Hammond was not discharged for just cause, the arbitrator stated the appropriate remedy was to immediately reinstate him and "make him whole for his losses by reason of the discharge." The arbitrator retained jurisdiction over the matter for 60 days "for the sole purpose of resolving disputes concerning the implementation of the remedy." The arbitrator also provided that if either party invoked his retained jurisdiction during the 60-day period, jurisdiction would be extended "for a period of time necessary to resolve the dispute." However, if neither party invoked his jurisdiction within 60 days, jurisdiction would lapse.

¶ 25    Subsequently, on October 5, 2012, the Village filed a two-count complaint to vacate the arbitration award, naming the Union and Hammond as defendants. Count I of the complaint alleged in part that at the time Hammond was laterally transferred from a part-time position to a full-time position, the Village had to follow the hiring procedures in the Illinois Municipal Code (Code) (65 ILCS 5/10-2.1-6 (West 2006)), which included an examination. The Village asserted that Hammond was not lawfully hired under the Code and therefore was not covered by the collective bargaining agreement. As a result, the arbitrator did not have jurisdiction to issue the award. Count II asserted in part that the arbitrator applied an incorrect quantum of proof and that the arbitrator exceeded his authority by requiring a predisciplinary hearing or meeting that was not part of the collective bargaining agreement.

¶ 26    In response, Hammond filed a motion to dismiss, contending that he must be dismissed from the action because he was not a party to the underlying grievance arbitration. Hammond asserted that the parties to a labor arbitration are the union and the employer. Additionally, the Union filed a motion to strike the portions of the Village's complaint that asserted that the arbitrator did not have jurisdiction to issue the award. The Union asserted that a party waives an objection to an arbitrator's jurisdiction if he fails to raise it at the arbitration, and the Village had agreed to the arbitrator's authority to hear the grievance and to the issue that the arbitrator was to resolve.

¶ 27    As to the Union's motion to strike, the Village responded that subject matter jurisdiction may be raised at any time. The Village further contended that its delay in objecting to the arbitrator's jurisdiction was justified because it only learned that Hammond was not lawfully hired after posthearing briefs were submitted, when another officer was terminated for similar reasons and filed a complaint in federal court. Attached to the Village's response was an affidavit from counsel for the Village in which he averred that during the summer of 2012, he received a copy of the federal complaint "for informational purposes" from either the attorney for the Village's insurance carrier or the Village attorney. However, counsel's

"reading of the *** [c]omplaint was not a priority" because the other officer's arbitration was not scheduled until after Hammond's arbitration. Counsel further stated that after an investigation, on September 7, 2012, counsel informed the Village that, in his opinion, Hammond had not been lawfully hired.

¶ 28    In its subsequent memorandum opinion and order, the circuit court granted Hammond's motion to dismiss, having found that Hammond did not need to be joined in the action and that the Village would not be prejudiced by his dismissal as a party defendant. The court also granted the Union's motion to strike, finding that the Village waived the argument that Hammond was not covered by the collective bargaining agreement and that the Village could have verified whether Hammond was lawfully hired before the arbitration.

¶ 29    After further briefing, the court entered a memorandum opinion and order that confirmed the award and entered judgment against the Village on its complaint to vacate the award.

¶ 30    On appeal, the Village first contends that the circuit court erroneously struck the references in its complaint to Hammond not being lawfully hired by the Village and therefore not covered by the collective bargaining agreement. The Village maintains that Hammond's status deprived the arbitrator of jurisdiction, which may be raised at any time.

¶ 31    Although the Village claims to challenge the arbitrator's jurisdiction, the substance of the Village's argument is that the dispute could not be subject to arbitration, an entirely different matter. Subject matter jurisdiction is defined as a court's power to hear and determine cases of the general class to which the proceeding in question belongs. *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 29 (citing *In re Luis R.*, 239 Ill. 2d 295, 300 (2010)). As an example of an instance where a court did not have subject matter jurisdiction, the Village cites to *Jones v. Industrial Comm'n*, 335 Ill. App. 3d 340 (2002). There, a statute precluded the cause of action that was before the Industrial Commission, thus depriving the Commission of subject matter jurisdiction. *Jones*, 335 Ill. App. 3d at 343. Here, the Village does not actually dispute the arbitrator's authority to hear the kind of grievance before it–whether an employee was terminated for just cause. Indeed, the collective bargaining agreement provides that arbitration is the third step for resolving disputes over the application or interpretation of the agreement, which contains provisions that the Village may discharge employees for just cause and employees may not be disciplined without just cause.

¶ 32    Rather than jurisdiction, the Village is actually challenging arbitrability–whether Hammond's grievance in particular could be subject to arbitration. Any issue regarding the nonarbitrability of a dispute is waived by participating in the arbitration proceedings. *Craig v. United Automobile Insurance Co.*, 377 Ill. App. 3d 1, 3 (2007). To preserve for judicial review the issue of whether a claim was subject to arbitration, a party must object in a timely manner, which is described as "the earliest possible moment to save the time and expense of a possibly unwarranted arbitration." (Internal quotation marks omitted.) *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 48 (2009). Through the operation of waiver, a party may become bound by an award that otherwise would be open to attack. *Id*. at 49. Even if the Village was correct that Hammond was not lawfully hired and therefore not covered by the collective bargaining agreement, the Village has waived its objection to arbitrability because it failed to object at the proceeding. Moreover, beyond merely failing to object, the Village agreed to the arbitrator's authority to resolve the dispute at the beginning of the proceeding and then repeated this position in its posthearing brief, stating "[h]opefully, it is clear from the [collective bargaining agreement] in the case at hand that the Arbitrator has the authority

to determine whether or not 'just cause' was/is present to discipline Grievant." Having failed to object and having repeatedly agreed to the arbitrator's authority, the Village waived the issue of arbitrability.

¶ 33    The Village unsuccessfully attempts to preserve the issue notwithstanding its previous position. To be sure, the issue of arbitrability can be preserved if a party can present a justification for the delay in objecting, such as an inability to discover pertinent facts. *Id*. Here, the Village asserts that it only became aware that Hammond was unlawfully hired when a federal complaint was filed by another officer on June 22, 2012, after posthearing briefs were filed. We are entirely unpersuaded by the Village's attempt to justify its delay. Hammond was hired as a part-time officer in 2006 and made a full-time officer in 2008. He was terminated in June 2011, the arbitration hearing was held in February and March 2012, and the award was issued on August 27, 2012. Between the time Hammond was hired as a full-time officer and the beginning of arbitration–not to mention the time between the end of arbitration and when the award was issued–the Village had ample time to learn whether Hammond was lawfully hired. The federal complaint may have alerted the Village to the question of whether Hammond was lawfully hired, but the Village has not demonstrated that anything prevented it from investigating Hammond's hiring well before the complaint was filed. See *Craig*, 377 Ill. App. 3d at 3-4 (where there was no reason why the insurance company could not have conducted a vehicle records search before arbitration, insurance company waived the issue of the plaintiff's false statements of vehicle ownership by failing to raise it until more than one year after the arbitration award). We also note that in counsel's affidavit in support of its response to the Union's motion to strike, counsel stated that reading the federal complaint "was not a priority" because the other officer's arbitration was not scheduled to occur until after Hammond's arbitration. Because the Village agreed to the arbitrator's authority to hear the dispute and failed to justify its delay in objecting, the issue is waived and the circuit court properly struck the relevant portions of the Village's complaint.

¶ 34    Next, the Village seeks to vacate the arbitration award on three grounds: (1) the arbitrator required an incorrect quantum of proof; (2) the award violates public policy; and (3) the arbitrator improperly required the Village to hold a pretermination hearing.

¶ 35    A court's review of an arbitrator's award is extremely limited (*Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 2013 IL 113721, ¶ 18), which reflects the legislature's intent in enacting the Illinois Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/1 *et seq.* (West 2012))–to provide finality for labor disputes submitted to arbitration (*AFSCME II*, 173 Ill. 2d at 304). Generally, the grounds for vacating an arbitration award are listed in section 12(a) of the Arbitration Act (710 ILCS 5/12(a) (West 2012)): (1) the award was procured by corruption, fraud, or other undue means; (2) there was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party; (3) the arbitrator exceeded his powers; (4) the arbitrator refused to postpone the hearing upon sufficient cause shown or refused to hear evidence material to the controversy or otherwise conducted the hearing as to substantially prejudice a party's rights; or (5) there was no arbitration agreement and the issue was not adversely determined in proceedings under section 2 of the Act and the party objected at the arbitration hearing.

¶ 36    However, section 12(e) of the Arbitration Act states that for an award "entered as a result of an arbitration agreement which is part of or pursuant to a collective bargaining

agreement," the grounds for vacating the award "shall be those which existed prior to the enactment of this Act." 710 ILCS 5/12(e) (West 2012). Thus, in collective bargaining cases, courts have applied the standards which existed for vacating an arbitration agreement at common law: fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. *Water Pipe Extension, Bureau of Engineering Laborers' Local 1092 v. City of Chicago*, 318 Ill. App. 3d 628, 636 (2000). Under this common law standard, a court must enforce the award if the arbitrator acts within the scope of his authority and the award draws its essence from the parties' collective bargaining agreement. *Id.*

¶ 37    Under the "essence of the agreement" standard, we inquire into the merits of the arbitrator's interpretation to determine only if the arbitrator's award drew its essence from the agreement so as to prevent a manifest disregard of the agreement between the parties. *Id*. The award will be overturned as not drawing its essence from the collective bargaining agreement where the arbitrator based his award on a body of thought, feeling, policy, or law outside of the contract. *Amalgamated Transit Union v. Chicago Transit Authority*, 342 Ill. App. 3d 176, 180 (2003). Further, an award will be vacated if the arbitrator exceeds his authority, and that authority is ordinarily determined by the provisions of the arbitration agreement. *Water Pipe Extension*, 318 Ill. App. 3d at 634. Whenever possible, arbitration awards should be construed to uphold their validity. *City of Northlake v. Illinois Fraternal Order of Police Labor Council*, 333 Ill. App. 3d 329, 335 (2002).

¶ 38    As its first challenge to the award, the Village contends that the arbitrator violated public policy by requiring the Village to establish just cause by clear and convincing evidence, rather than by a preponderance of the evidence. According to the Village, the preponderance of the evidence standard applies to cases involving the termination of police officers, even when the allegations relate to criminal conduct. The Village further argues that the arbitrator did not have the power to adopt his own quantum of proof, and his choice of the clear and convincing evidence standard exceeded his authority.

¶ 39    We first clarify that selecting a quantum of proof is a legal issue, not a matter of public policy. While there is no precise definition of "public policy," in general it can be said that public policy concerns what is right and just and what affects the citizens of the state collectively. *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130 (1981). See also *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 341 (1989) (stating that while "public policy" lacks precise definition, "it may be stated generally as a legal principle which holds that no one may lawfully do that which has a tendency to injure the public welfare"). Determining the quantum of proof is not a matter that affects the public welfare, but is instead a question of law. In the context of arbitration awards, gross errors of judgment in law are not grounds for vacating an award unless the errors are apparent on the face of the award. *Chicago Transit Authority v. Amalgamated Transit Union Local 308*, 244 Ill. App. 3d 854, 863 (1993).

¶ 40    Here, the arbitrator properly selected a quantum of proof. As a general matter, in arbitration proceedings, the quantum of proof required to support a decision to discharge an employee is unsettled. Frank Elkouri & Edna Elkouri, How Arbitration Works 15-24 (7th ed. 2012). Generally, it is up to the arbitrator to determine the required quantum of proof. See *id.* at 15-26. While most arbitrators apply the preponderance of the evidence standard to ordinary discipline and discharge cases, in cases involving criminal conduct or stigmatizing behavior, many arbitrators apply a higher burden of proof, typically a clear and convincing

evidence standard. *Id.* at 15-25. Here, the collective bargaining agreement is silent on the required quantum of proof. Because the parties contracted to have their disputes settled by an arbitrator, rather than a judge, it was the arbitrator's view of the contract that the parties agreed to accept (*AFSCME II*, 173 Ill. 2d at 305), including the required quantum of proof.

¶ 41    However, it is curious that the Village challenges the award on this basis because the arbitrator ultimately considered whether the allegations were proven by a preponderance of the evidence–the Village's desired quantum of proof. In contrast to the arbitrator's initial statement that he would apply a clear and convincing evidence standard, in his written decision, the arbitrator stated that he believed that the evidence "preponderates in favor of [Hammond's] explanations" and that "the Department cannot carry its burden–under any quantum of proof–of proving that [Hammond] intended to commit theft by depositing the checks from Berkley." We acknowledge that this approach is unusual. Nonetheless, the arbitrator's finding eliminates any grounds for vacating the award based on the quantum of proof. Even if the arbitrator erred in his initial choice of clear and convincing evidence, any error had no effect because the arbitrator found that the Village failed to meet its burden by any standard. As such, the arbitrator's chosen quantum of proof is not a basis for vacating the award.

¶ 42    The Village's second challenge to the award is that it violates public policy. The Village argues that Hammond deserved to be terminated and that the arbitrator ignored natural inferences from the record. In addition to asserting that Hammond committed theft, the Village also argues that concealing the double payments and failing to immediately report the payments constitutes conduct unbecoming an officer. The Village contends that ordering Hammond to be reinstated violates the public policy that police officers shall not be thieves and that police officers must exercise a high degree of honesty, trustworthiness, and common sense because they occupy a unique position in society.

¶ 43    The Village presumes that Hammond intended to commit theft and therefore the Village had just cause to terminate him, contentions the arbitrator rejected. We may not disturb the arbitrator's findings on these issues. Where the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept. *Griggsville-Perry Community Unit School District No. 4*, 2013 IL 113721, ¶ 18. Further, where, as here, "just cause" is not defined in the collective bargaining agreement, it is left up to the arbitrator to determine if the grievants were discharged for just cause. *American Federation of State, County & Municipal Employees v. State*, 124 Ill. 2d 246, 256 (1988) (*AFSCME I*). Additionally, a court may not reverse an arbitrator's decision simply because it is contrary to the manifest weight of the evidence. *City of Northlake*, 333 Ill. App. 3d at 335. After weighing the evidence at the hearing, the arbitrator determined that Hammond did not intend to commit theft and was not terminated for just cause. We may not do what the Village essentially asks us to do–reweigh the evidence that was before the arbitrator. A court has no business weighing the merits of a grievance. *Griggsville-Perry Community Unit School District No. 4*, 2013 IL 113721, ¶ 18. We decline to disturb the arbitrator's interpretation of the facts and his finding that Hammond was not terminated for just cause.

¶ 44    Because Hammond was not found to have committed theft, there is no cause for concern that his reinstatement would violate any supposed public policy that police officers should not be thieves. As to the Village's other concerns about Hammond's relative trustworthiness

and honesty, the Village has failed to identify a public policy at stake. Courts have crafted a public policy exception to vacate arbitration awards which otherwise derive their essence from a collective bargaining agreement. *AFSCME II*, 173 Ill. 2d at 306. To vacate an arbitration award on this basis, we must find that the contract as interpreted by the arbitrator violates some explicit public policy that is well-defined and dominant. *AFSCME I*, 124 Ill. 2d at 261. The public policy at issue is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Id*. The public policy exception is a narrow one and is invoked only when a contravention of public policy is clearly shown. *AFSCME II*, 173 Ill. 2d at 307. The threshold question is whether a well-defined and dominant public policy can be identified. *Id*. If so, the court must determine whether the award, as reflected in the arbitrator's interpretation of the agreement, violated the public policy. *Id*. at 307-08.

¶ 45    The Village cites a number of cases that supposedly establish a public policy "in favor of maintaining the public's trust in law enforcement officials": *Remus v. Sheahan*, 387 Ill. App. 3d 899, 904 (2009) (in reviewing action of Cook County Sheriff's Merit Board's dismissal of officer for misconduct, stating that a law enforcement officer is in a unique position of public trust and responsibility); *Kvidera v. Board of Fire & Police Commissioners*, 192 Ill. App. 3d 950, 965 (1989) (in reviewing decision of a board of fire and police commissioners to discipline an officer, agreeing with the board that the officer's conduct had a tendency to destroy public respect and raised serious questions about the officer's integrity and trustworthiness); *Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d 864, 869 (1972) (in reviewing decision of a board of fire and police commissioners to discharge an officer, stating that discipline is necessary for the proper functioning of the police department and to keep the respect of the public); and *People ex rel. Horwich v. Powell*, 127 Ill. App. 614, 619 (1906) (in reviewing decision of Civil Service Commission to remove officer, noting officer's "lack of fidelity to that duty imposed upon him by law" and noting that he betrayed the trust of the municipality).

¶ 46    The Village's cases merely discussed desired officer behavior in the context of reviewing a municipality's decision to discipline an officer. None purported to establish a well-defined and explicit public policy that applies to even the Village's theory of the events, which we again note the arbitrator rejected. See *City of Highland Park v. Teamster Local Union No. 714*, 357 Ill. App. 3d 453, 464 (2005) (cases that discussed officer trustworthiness in the context of a municipality's decision to discharge a misbehaving police officer did not establish an explicit public policy that required vacating an award that reinstated an officer who committed a misdemeanor). One additional case cited by the Village, *State Police v. Fraternal Order of Police Troopers Lodge No. 41*, 323 Ill. App. 3d 322, 329-30 (2001), found that a procedural rule limiting internal investigations violated the public policy of effective law enforcement, but that case concerned an entirely different matter than the conduct at issue here. Overall, we find that the Village's assertions about the need for officers to be trustworthy and corresponding citations are "generalized considerations of supposed public interest," which are insufficient to find a well-defined and dominant public policy. See *AFSCME II*, 173 Ill. 2d at 307.

¶ 47    In reaching this conclusion, we do not suggest that it is acceptable for police officers to be thieves or otherwise untrustworthy. We merely find that the Village has failed to show that its stated concerns–however important–rise to the level of an explicit and well-defined

public policy. Moreover, even if there were a public policy favoring trustworthy police officers, it is difficult to see how reinstatement would violate that policy where Hammond provided an "innocent explanation of his actions" and was not found to have intended to commit theft.

¶ 48    We are also not persuaded by the Village's attempt to identify a second public policy at stake: the public policy against receiving both Act and workers' compensation benefits. As support, the Village cites *City of Jacksonville v. Coop*, 176 Ill. App. 3d 527, 529 (1988), where the court found that an employee's attempt to receive both Act and workers' compensation benefits "would permit the double recovery" the legislature sought to prevent. Putting aside the question of whether this statement in *Coop* is sufficient to find a well-defined and dominant public policy, we note that for the public policy exception to apply, it is not merely the commission of an alleged offense that must violate public policy, but the employee's reinstatement. *City of Highland Park*, 357 Ill. App. 3d at 466. Again, the Village has failed to show how Hammond's reinstatement–where Hammond was not found to have intended to commit the offense and the Village ultimately recouped the extra payments–violates this alleged public policy. We conclude that the public policy exception is not a basis for vacating the award.

¶ 49    In its third challenge to the award, the Village contends that the arbitrator exceeded his authority by mandating a pretermination hearing. Although the arbitrator found that the Village failed to provide an opportunity for Hammond to be heard prior to his termination, this was not a basis for the arbitrator's award. In his decision, the arbitrator refused to order reinstatement without considering the merits, believing that "[*AFSCME II*] forecloses that option in a case such as this." At the end of his decision, after concluding that Hammond did not intend to commit theft, the arbitrator explained that "[i]n light of the outcome on the merits, there is no need to address the appropriate remedy for the due process violations." Because the absence of a pretermination hearing had no impact on the award, we decline to address this issue.

¶ 50    Finally, the Village contends that if the arbitration award is upheld, the matter should be remanded to the arbitrator to determine a setoff. The Village argues that it is entitled to deduct from the back wages owed to Hammond the amount that Hammond earned from outside employment while he was terminated. Accordingly, the Village asserts, the matter should be remanded to the arbitrator for further proceedings. In response, the Union contends that the request for remand to determine a setoff is not properly before this court and should be stricken.

¶ 51    It is unclear on what basis the Village believes it is entitled to a remand. The whole of the Village's argument appears to be that because employers are entitled to a setoff in other contexts, the matter should be remanded to the arbitrator here. In general, an award can be remanded to the arbitrator so that the arbitrator can correct a mistake that is apparent on the face of the award, complete an arbitration that is not complete, or clarify an ambiguity in the award. *Federal Signal Corp. v. SLC Technologies, Inc.*, 318 Ill. App. 3d 1101, 1111 (2001). The Village has not suggested that we remand for any of these reasons. In the Village's complaint to vacate the award, the Village made no mention of a setoff or any other reason to remand the matter to the arbitrator. Issues and arguments that were not presented to or considered by the trial court cannot be raised for the first time on review. *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 346 Ill. App. 3d 264, 276 (2004). Further, it is unclear

- 13 -

why the Village is asking for a remand when, according to its reply brief, it asked the arbitrator to retain jurisdiction until the present appeal was exhausted.

¶ 52　　Nonetheless, waiver is a limitation on the parties and not on this court and we may address an issue to carry out our responsibility to reach a just result. *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 202 (2007). We find that the arbitration award does not entitle the Village to a setoff. Our research has not revealed an Illinois case that considered a claim for a setoff that was not presented during a labor arbitration. However, because of the common origin of the federal and Uniform Arbitration Acts, and because the Illinois Uniform Arbitration Act is patterned after the Uniform Arbitration Act, we may look to the decisions of other state and federal courts for guidance. *Federal Signal Corp.*, 318 Ill. App. 3d at 1111-12.

¶ 53　　The Seventh Circuit has stated that arbitrators have discretion to decide whether lost earnings should be offset by interim earnings or a failure to mitigate and their silence on such issues means that no such offsets are to be made. *Automobile Mechanics Local 701 v. Joe Mitchell Buick, Inc.*, 930 F.2d 576, 578 (7th Cir. 1991). We also find instructive *International Union of Operating Engineers, Local No. 841 v. Murphy Co.*, 82 F.3d 185 (7th Cir. 1996). There, at the arbitration hearing, the parties filed a fact sheet that stated that the remedy sought was " 'all Wages and Fringes' " and reinstatement. *Murphy Co.*, 82 F.3d at 186. At the arbitration, the matter of damages never came up and the award stated that the employees " 'shall be reinstated *** and made whole.' " *Id*. The court found that when the fact sheet was read with the arbitrator's ruling, the award granted restoration of those wages and fringe benefits lost due to the inappropriate firings, and the arbitrator's silence on the question of offsets for interim earnings meant that no such offsets were to be made. *Id*. at 189. Similarly, here, the Union's grievance stated that it sought to reinstate Hammond to full employment and compensate him "for any lost wages and benefits, in part and in whole, make grievant whole." The Village never requested a setoff before the arbitrator, and the award stated that Hammond should be immediately reinstated and the Village should "make him whole for his losses by reason of the discharge." Reading the requested remedy in the grievance with the arbitrator's ruling, we find the award grants Hammond lost wages and benefits and reinstatement with no deduction for a setoff. This result is also consistent with cases from two other states: *In re Arbitration Between Civil Service Employees Ass'n Inc., Local 1000, AFSCME & State of New York*, 636 N.Y.S.2d 234, 236 (N.Y. App. Div. 1996) (absence of any reference to deduction, setoff, or mitigation in the arbitrator's decision establishes that earnings and unemployment benefits received by the employee after termination should not be deducted from back pay); *Wisconsin State Employees Union (WSEU), AFSCME v. Wisconsin Employment Relations Comm'n*, 525 N.W.2d 783, 787 (Wis. Ct. App. 1994) (where the arbitrator never indicated that the award should be offset or prorated by any factor, it was clear that the arbitrator did not consider prorating the award and the employer was ordered to pay all wages and lost benefits).

¶ 54　　Based on the Village's failure to raise the setoff issue before the arbitrator and the arbitrator's silence on the subject, we find that the award does not include a setoff. Accordingly, we decline to remand the matter to the arbitrator.

¶ 55　　For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 56　　Affirmed.

¶ 57        JUSTICE DELORT, specially concurring.

¶ 58                    But in this Court, what Diff'rence does appear!
                       For every one's both Judge and Jury here;
                       Nay, and what's worse, an Executioner.[2]

¶ 59        This case illustrates that local governmental officials who throw out the rule book and appoint themselves to be judge, jury and executioner run the risk of ending up with a costly and unfavorable result. It also shows that binding arbitration of employee grievances can sometimes generate a different result than would be obtained in an administrative proceeding or a court of law, and how difficult it is to obtain judicial relief from an unfavorable arbitral ruling. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (hereinafter *AFSCME II*). The union's brief describes the Village's actions as "nothing but a series of blunders." That's an understatement. The ultimate result here hinged on any of a number of bad decisions made by the Village itself.

¶ 60        The arbitrator's ruling rested on the fact that the Village decided to treat this as a criminal theft case. Viewing the evidence in that light, the arbitrator determined that there was no just cause to fire Hammond for theft even though the Village's own staff mistakenly sent Hammond checks for replacement pay and other benefits in excessive amounts and Hammond had–to the Village's astonishment–actually cashed them. To make matters worse, the Village apparently decided to recover the double payments by unilaterally deducting them without prior notice from the officer's final paycheck–an action which would apparently violate the Illinois Wage Payment and Collection Act (820 ILCS 115/9 (West 2012)). As the arbitrator noted, "Because the offense underlying these charges turns on his state of mind, and because [the Village] made no effort to determine his state of mind, [it] left open an opportunity for him to offer an innocent explanation of his actions." Hammond had several past injury claims, and the checks were for odd amounts and not clearly described, so the arbitrator found Hammond's explanation of confusion was sufficient to negate any presumption of criminal intent. Hammond may well have known what was going on all the time and hoped the Village staff would never notice the double payments. However, it was the arbitrator who heard the testimony and had the right to decide the matter. It is not within our province to overturn him.

¶ 61        The Village also complains that the arbitrator should not have found that Hammond was entitled to a pretermination hearing. The majority finds that "[b]ecause the absence of a pretermination hearing had no impact on the award, we decline to address this issue." *Supra* ¶ 49. I disagree and believe the issue should be addressed. The Village defends its failure to provide a pretermination hearing by arguing that the Union simply collectively bargained away all of its members' constitutional and statutory rights regarding employment termination, allowing the Village to fire them after investigating, charging, and trying them without any prior notice to them. This is absurd. No union in its right mind would have

---

[2]*Epilogue* to William Congreve, The Double Dealer, *in* 28 Bell's British Theatre 119 (George Cawthorn, British Library (Strand ed. 1797)).

signed such a contract, and the contract in the record contains no such provision. The contract contains a standard management rights clause allowing the Village to "discipline, suspend, and discharge employees for just cause," but the contract does not provide that the Village can ignore statutory or constitutional protections when doing so. Here, the Village committed the rather astonishing act of firing a full-time sworn police officer by letter without providing any opportunity for the officer to respond *before* being fired.[3] The arbitrator and the trial judge both found that the officer was entitled to at least a *Loudermill*-type hearing[4] before being fired, and I agree. See also *Prato v. Vallas*, 331 Ill. App. 3d 852, 867-68 (2002) (describing *Loudermill*'s applicability to pretermination hearings of Illinois tenured public employees).

¶ 62   After the arbitrator had ruled, the Village attempted to extricate itself from his ruling by filing this case. As the majority correctly notes, Illinois law provides very narrow avenues for courts to overturn arbitrators' awards. One of them, "against public policy," however, is a court-made loophole through which imaginative attorneys can drive the proverbial train. The Village argues that the arbitrator's decision violated public policy because: (1) theft is against public policy in Illinois; and (2) the officer was never legally hired in the first place because he was somehow slipped onto the full-time payroll without being competitively tested by the Board of Fire and Police Commissioners as required by state law.

¶ 63   The majority resolves the first argument by stating that retaining untrustworthy police officers is not against "an explicit and well-defined" public policy in Illinois. *Supra* ¶¶ 44-48. I do not join that part of the majority's analysis. The Village raises "trustworthiness" here as an element of Hammond's alleged crime. As a crime, theft is, by definition, against public policy. See, *e.g.*, *In re Estate of Feinberg*, 235 Ill. 2d 256, 265 (2009) (contracts that violate statutes are void as against public policy). I would instead simply note that the arbitrator, as the ultimate fact finder, found there was no theft or lack of trustworthiness because of lack of intent and leave it at that. See, *e.g.*, *AFSCME II*, 173 Ill. 2d at 307 (holding that to vacate an arbitral award on public policy grounds, the contract, *as interpreted by the arbitrator*, must violate some explicit public policy).

¶ 64   The second point, that Hammond was never legally hired in the first instance, raises an entirely new issue that has nothing to do with the "just cause" issue which was before the arbitrator. I recognize that elected officials in small communities are often frustrated with the difficulty they have in hiring their choices as police officers and firefighters, and in implementing wholesale firings of those hired under previous regimes. For over a half century, Illinois law has prevented that practice and required that full-time police officers be hired on merit according to scores on a competitive public examination. See 65 ILCS

[3]Normally, full-time Illinois police officers in municipalities as large as Posen cannot be fired except through notice, charges, and a hearing before the municipal board of fire and police commissioners. Posen is a home rule unit of government, however, and therefore can adopt hiring and firing procedures different from those set forth in the Illinois Municipal Code (65 ILCS 5/10-2.1-1 *et seq.* (West 2012)), commonly known as the "Police and Fire Commissioners Law." Nothing in the record suggests the Village has done so. The union contract here, like many police contracts, allows employees to take disciplinary matters out of the hands of local commissions submitting them to binding arbitration by an independent arbitrator.

[4]See generally *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

- 16 -

5/10-2.1-1 *et seq.* (West 2012). That has not stopped some municipalities from simply putting people on police payrolls, and the Village suggests that it illegally hired Hammond as a full-time officer in the first place. The Union disagrees and strongly asserts the facts would bear out that Hammond was legally hired. We cannot resolve that issue on this record. If, as it claims, the Village suddenly "discovered" years after the fact that *the Village itself* illegally slipped Hammond onto the full-time payroll without having him tested and appointed by the Board of Fire and Police Commissioners, this case was certainly not the right vehicle to rectify that error.

¶ 65    In sum, with the exceptions noted herein, I concur with the excellent analysis of the majority and the result it has determined.