2020 IL App (1st) 191460-U

SIXTH DIVISION
May 22, 2020

No. 1-19-1460

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| CRAVEABLE HOSPITALITY GROUP, LLC, f/k/a WATERSHED VENTURES LLC, SHYTOWN B BOX 1 MANAGEMENT LLC and SHYTOWN 168 LLC, | ) Appeal from the Circuit Court of ) Cook County ) ) |
| Petitioners-Appellees, | ) ) |
| v. | ) No. 2018 CH 3103 ) |
| MUSA TADROS, THE MUSA TADROS FAMILY LIMITED PARTNERSHIP II, CROWN SERIES LLC, 168 N. MICHIGAN SERIES, SHYTOWN B BOX 1 LLC, and SHYTOWN, LLC, | ) Honorable Eve M. Reilly, ) Judge Presiding ) ) ) |
| Respondents-Appellants. | ) |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The trial court's orders granting petitioners' petition to confirm the arbitration award and for entry of judgment, denying respondents' motion to vacate the arbitration award, and granting petitioners' motion to dismiss respondents' counterclaim are affirmed.

¶ 2    Respondents, Musa Tadros (Tadros), The Musa Tadros Family Limited Partnership II (Tadros Partnership), Crown Series LLC, 168 N. Michigan Series (Crown), Shytown B Box 1 LLC (Shytown B Box 1), and Shytown, LLC (Shytown), appeal the trial court's order that denied respondents' motion to vacate the arbitration award entered in favor of petitioners' Craveable Hospitality Group, LLC, f/k/a Watershed Ventures LLC (Watershed), Shytown B Box 1 Management LLC (B Box 1 Management), and Shytown 168 LLC (Shytown 168). Respondents also appeal the trial court's orders that confirmed the arbitration award, granted petitioners' motion to confirm the arbitration award, and granted petitioners' motion to dismiss respondents' counterclaim. We affirm.

¶ 3    This case is based on a business relationship involving Watershed, a professional restaurant management company, and respondent Musa Tadros, an owner and developer of real estate in Chicago. The business relationship involved various agreements, including the creation of certain limited liability companies, formed in connection with developing and owning two restaurants in Chicago (Restaurant Projects).

¶ 4    The parties created Shytown, LLC to own one of the restaurants located at 168 North Michigan Avenue and Shytown B Box 1, LLC to own the other restaurant located near Clark Street and Adam Street (Restaurant LLCs). Operating agreements were executed for each restaurant entity and each entity consisted of two members, which included one entity owned by Watershed and one entity owned by Tadros. Shytown's members were Shytown 168, which was controlled by Watershed, and Crown, which was controlled by Tadros. Shytown B Box 1's members were B Box 1 Management, which was controlled by Watershed, and the Tadros Partnership, which was

controlled by Tadros. The managers of each restaurant entity were Tadros and Stephen Goglia, the CEO and president of Watershed.

¶ 5     In December 2013 and August 2013, the operating agreements were executed for Shytown and Shytown B Box 1, respectively. The operating agreements contained similar provisions and provided that they were made between the "[p]ersons who are identified as Members." The operating agreement for Shytown B Box 1 identified Crown and B Box 1 Management as members and the operating agreement for Shytown identified Crown and Shytown 168 as members. Each operating agreement contained an arbitration provision stating, in relevant part, as follows:

> "(ii)     Except for seeking relief from a court of competent jurisdiction for the issuance of an injunction or other form of emergency relief, the parties agree that any disputes which may arise out of or in connection with this Agreement shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association (while the Project is in its construction phase) and, thereafter, the Commercial Arbitration Rules of the American Arbitration Association *** The demand for arbitration shall be filed in writing with the American Arbitration Association in the county where the project is located within a reasonable time after the dispute has arisen."

¶ 6     The Shytown B Box 1 operating agreement showed that Tadros signed his name under the Tadros Partnership signature block and that he indicated his title was "President" of Crown, which was the general partner of the Tadros Partnership. The Shytown operating agreement showed that Tadros signed under the Crown signature block and that he indicated his title was "President" for Crown.

¶ 7    In March 2016, petitioners filed a Demand for Arbitration against respondents with the American Arbitration Association's (AAA) office in New York City. Petitioners' demand specifically identified Tadros as an individual respondent. Petitioners alleged that Tadros conspired with celebrity chef David Burke, who was Watershed's former managing member, to illegally abandon the Restaurant Projects and pursue them in a new venture with Burke. Petitioners alleged that, after the various contracts were executed for the Restaurant Projects, Watershed invested significant time and money in the projects and worked with Tadros for over one year to develop the restaurants. In May 2014, when the restaurants were a few months away from opening, Tadros informed petitioners that he was going to abandon the Restaurant Projects with Watershed and pursue the same projects with Burke. Shortly thereafter Burke resigned as Watershed's managing member and Tadros and Burke formed a partnership to pursue the Restaurant Projects, at which time the joint venture between Tadros and Watershed ended.

¶ 8    Petitioners alleged that Tadros and Watershed entered into a series of contracts, including an operating and management agreement for each restaurant, memorializing their agreement to develop the Restaurant Projects. They alleged that Watershed spent substantial amounts of time and money negotiating the agreements with Tadros, that Tadros breached the governing contracts, and that Tadros violated the fiduciary duties he owed to Watershed. Petitioners alleged that Tadros schemed with Burke to divert the Restaurant Projects and used Watershed's confidential financial information to do so. Petitioners stated that Tadros breached his contractual obligations as manager of each of the Restaurant LLCs, which required him to "not permit to be diverted to any other Person sources of revenue properly belonging to the Company." They alleged that Tadros's use of Watershed's confidential financial information was "an additional breach of [Tadros's] duties

under the Operating Agreements." Petitioners asserted that Tadros was liable for the damages Watershed suffered, including lost profits it would have earned if Tadros would have honored his contractual duties.

¶ 9    Petitioner's demand for arbitration asserted six claims, including breach of the Shytown B Box 1 operating agreement against the Tadros Partnership by B Box 1 Management and breach of the Shytown operating agreement against Crown by Shytown 168 (claims I and II). Petitioners alleged in these claims that Tadros, acting on behalf of the Tadros Partnership and Crown, breached the operating agreements by actively working in bad faith to prevent them from being performed. Petitioners further alleged that the operating agreements provided that Tadros, as manager, "shall not permit to be diverted to any other Person sources of revenue properly belonging to" the respective Restaurant LLC. Petitioners' demand alleged claims for breach of the management agreements against Shytown B Box 1 (claim III) and against Shytown (claim IV). Petitioners' demand also included a claim by Watershed against Tadros for aiding and abetting breach of fiduciary duty (claim V) and a claim by B Box 1 Management and Shytown 168 against Tadros for breach of fiduciary duty (claim VI).

¶ 10    The record shows that, on April 16, 2016, the AAA sent a letter to the parties providing basic information about the AAA process and informing them that the matter was being administered under the AAA Commercial Arbitration Rules and Mediation Procedures (AAA Rules). On April 21, 2016, the AAA sent another letter to the parties stating that the parties had held an administrative conference call that same day and that, "[p]er 12.13 of the parties' contracts," the AAA Rules " apply to this matter." The letter stated that the parties had agreed to equally advance the compensation for the mediator and agreed to "mediation on a **parallel track**

to Arbitration" under R-9 of the AAA Rules. (Emphasis in original.) With respect to location of the arbitration, the letter explained that the parties' contract did not specify a hearing location, that petitioners requested New York City as the location, and that respondents had until April 26, 2016, to comment on the matter. The letter noted that respondents had until May 5, 2016, to respond to petitioners' demand for arbitration.

¶ 11     The record contains a letter from respondents' counsel to the AAA dated April 25, 2016, advising the AAA that respondents "dispute New York as the proper forum for the Arbitration."[1] Citing provisions of the operating agreements, respondents asserted that the operating agreements "clearly require that this Arbitration be held in Cook County, Illinois." The letter stated that, "if the arbitration provisions of the Operating Agreement are to be given effect, the demand for arbitration should have been filed in Cook County, Illinois, which is the proper forum here." The respondents concluded by stating that "the Operating Agreements, and the facts of Watershed's demand, all require that the Arbitration be held in Illinois by Illinois arbiters who are versed in the Illinois law that governs the dispute."

¶ 12     On May 5, 2016, respondents, including Tadros, filed an answer to the demand for arbitration. Respondents filed three affirmative defenses but did not assert that the claims against Tadros were not arbitrable.[2] The record contains a letter from petitioners' counsel, on behalf of the parties, to the AAA dated May 12, 2016, explaining that the parties had "agreed to forego the requirement under the operative arbitration agreement to conduct the arbitration through party

---

[1] During the arbitration proceedings, respondents were represented by the same counsel and documents filed by respondents' counsel were filed on behalf of all respondents, including Tadros.

[2] Although respondents' answer in the record does not include a date showing when the answer was filed, the trial court's order denying Tadros's motion to vacate the arbitration award stated that the answer was filed on May 5, 2016. On appeal, respondents do not dispute that they filed their answer on this date.

arbitration" and that they also had "agreed that the arbitration should be conducted before a single arbitrator." The letter explained that the parties believed "this will expedite the prearbitration procedures and streamline the Arbitration itself." Petitioners' counsel stated in the letter that, "[u]nless we hear otherwise from you, the Parties intend to proceed pursuant to Rule R-12" of the AAA Rules.

¶ 13   On September 10, 2016, respondents' counsel served a request for production of documents to petitioners, stating that the request was being made under Rule 22(b) of AAA Rules. Respondents requested numerous documents, including, *inter alia*, all documents relating to "the fiduciary duties that Tadros had to Watershed or the LLCs," "sabotage by Tadros of any partnership referenced in the Demand for Arbitration," "collusion by Tadros to cut Watershed out of any project," "benefits that Tadros received at the expense of his partnership with Watershed," "breach by Tadros of the governing contracts," and "how Tadros aided and abetted Burke's breach of his fiduciary duties to Watershed."

¶ 14   In April 2017, the parties filed a joint motion to the AAA, requesting that the May 2017 arbitration hearing date be continued to August 2017 in order to accommodate the witnesses and to allow the parties to complete discovery. The motion stated that the parties had produced about 11,000 pages of documents and that Tadros and another key witness had been deposed.

¶ 15   On July 28, 2017, petitioners filed an amended demand for arbitration. Petitioners' amended demand added Tadros to the header of their claims asserting breach of the operating agreements (claims I and II). The allegations contained in these claims are the same as the original demand. Petitioners also added one claim against Tadros for tortious interference with the operating and managements agreements by B Box 1 Management and Shytown 168 (claim VII).

¶ 16    On August 8, 2017, respondents filed their answer to the amended demand for arbitration and asserted 14 affirmative defenses.[3] One affirmative defense alleged that claims against Tadros, Shytown B Box 1, and Shytown were "not arbitrable because they are not parties to the arbitration agreement" and another alleged that Tadros was "not individually liable for any claim for breach of contract because he was not a party in his individual capacity to any of the contracts at issue in this matter." Respondents alleged in another affirmative defense that petitioners' claims for lost profits belonged to Shytown or  Shytown Box 1, not to petitioners in their individual capacity. Respondents requested that the amended demand for arbitration be dismissed.

¶ 17    On August 8, 2017, respondents filed a pretrial memorandum.[4] Respondents asserted that Tadros, Shytown B Box 1, and Shytown were not parties to the operating agreements. They argued, therefore, that these respondents were not proper parties to the arbitration and that "no award" could be made against them. Respondents requested "an award in their favor."

¶ 18    On August 14, 2017, the first day of the arbitration hearing, the arbitrator acknowledged at the beginning of the hearing that respondents had argued in their pretrial memorandum that certain respondents could not be bound by the arbitration agreement. The arbitrator told the parties that the proceeding would go forward, the parties could raise the issue during the testimony, and that, at some point, she would need to know the parties' positions on the issue, noting that it could affect evidentiary issues and any relief that she would award at the end. Neither party objected. In

---

[3] Respondents' amended answer to the amended demand for arbitration contained in the record does not show the date the amended answer was filed. The trial court's order denying respondents' motion to vacate the arbitration award stated that respondents filed their amended answer on August 8, 2017. On appeal, the parties do not dispute that the respondents' filed their amended answer on this date.

[4] Although respondents' pretrial memorandum included in the record does not show the date the pretrial memorandum was submitted, petitioners' brief states that the memorandum was submitted on August 8, 2017. Tadros does not dispute this date.

respondents' opening statement, counsel asserted that Tadros, Shytown B Box 1 and Shytown were not parties to any arbitration and that, therefore, counsel did not "think they can receive an award *** or that claimants can obtain an award against them."

¶ 19    Following a five-day hearing, the parties submitted written closing arguments. In respondents' written closing argument, they asserted that "Tadros did not sign the operating agreements in his individual capacity" and, therefore, he was not subject to the arbitration provisions and must be dismissed. The parties also submitted posthearing briefs. In respondents' response to petitioners' posthearing brief, they asserted that Tadros, Shytown B Box I, and Shytown were "not parties to any arbitration agreement," and that, therefore, the arbitrator could not enter an award against them. Respondents asserted that their objection was timely because it was raised before the arbitration hearing began.

¶ 20    In January 2018, the arbitrator entered an award, finding that it had jurisdiction over the parties and claims. The arbitrator concluded that the operating agreements "show that they were intended to bind not only the specific signatories but also each Restaurant LLC, its Members and their Managers, to their various terms" and that, therefore, Tadros, Shytown B Box 1, and Shytown (the Restaurant LLCs) were bound by the arbitration clauses. The arbitrator further concluded, in the alternative, that respondents waived their objection to arbitration because they failed to raise the objection in their answer to petitioners' original arbitration demand in which they were "first named as respondents."

¶ 21    With respect to the merits of petitioners' demand, the arbitrator concluded that Tadros breached the operating agreements and the duties he owed to each Restaurant LLC. The arbitrator found that Tadros "did not act in good faith," "did not exercise his rights and powers to assure that

the terms of the Operating Agreement were complied with," and "permitted sources of revenue properly belonging to the restaurant LLC to be diverted to himself." The arbitrator concluded that Tadros breached his fiduciary duties of loyalty and honesty to the joint ventures, stating that he "engaged in extensive efforts to conceal his activities from Watershed" and that he "deceived" Watershed's CEO "by leading him to believe that he was continuing to work, in good faith, on the Restaurant Projects." The arbitrator stated that Tadros's "efforts to deceive Watershed continued through the time of the hearing."

¶ 22     The arbitrator concluded that B Box 1 Management was entitled to recover $1,600,000 from Tadros, which represented lost profits for one of the restaurants, and that Shytown B Box 1 Management and Shytown 168 were jointly entitled to recover from Tadros $300,000, which represented direct costs incurred for the Restaurant Projects. The arbitrator also ordered Tadros to reimburse petitioners a total of $32,540 in AAA fees and expenses.

¶ 23     In March 2018, petitioners filed a petition to confirm the arbitration award with the trial court. Thereafter, in April 2018, Tadros filed a motion to vacate the arbitration award, asserting, *inter alia*, that he signed the operating agreements in his representative capacity, not individually, and that, therefore, he was not bound by the arbitration clauses contained therein. Tadros argued that he did not waive his right to object to arbitration. Tadros also filed a counterclaim against petitioners, asserting that the arbitrator exceeded her authority when she found that the claims against him were arbitrable and entered lost profits against him.

¶ 24     In February 2019, the trial court issued a written order denying Tadros's motion to vacate the arbitration award. In doing so, the trial court found that Tadros waived his objection under Illinois law, the AAA rules, and the Federal Arbitration Act (FAA), stating that he participated in

- 10 -

arbitration without a timely objection and that he waived "any jurisdictional or contractual objection by virtue of his willing submission to the arbitrator's jurisdiction." The court noted that Tadros did not object at the time he filed his answer and objected only five days before the arbitration hearing was scheduled to begin. Thereafter, in March 2019, the trial court issued a written order granting petitioners' motion to dismiss Tadros's counterclaim for the same reasons stated in its order denying his motion to vacate the arbitration award. In June 2019, the court entered an order confirming the arbitrator's award. This appeal followed.

¶ 25                                      II. Analysis

¶ 26                                 A. Waiver/Forfeiture

¶ 27    Tadros asserts that he was not a party to operating agreements and therefore was not bound by the arbitration provisions contained therein. The arbitrator concluded that Tadros waived his objection to the arbitration because he failed to object in his answer to the original arbitration in which he was first named as a respondent. The trial court agreed that Tadros waived his objection to arbitration, finding that Tadros waived any contractual and jurisdictional objection because he submitted to the arbitrator's jurisdiction and participated in the arbitration without timely questioning the arbitrator's authority to resolve the dispute. Tadros argues that the trial court incorrectly found that he waived his objection to the arbitrability of the claims against him because he made his objection before the arbitration hearing began.

¶ 28    We generally review the issue of whether a claim is subject to arbitration *de novo*. *First Health Group Corp. v. Ruddick,* 393 Ill. App. 3d 40, 48 (2009). However, in order to preserve the issue of whether a claim is subject to arbitration for judicial review, a party must object to the arbitration in a timely manner. *First Health Group Corp.*, 393 Ill. App. 3d at 48. "The objection

should be made at the earliest opportunity and must occur no later than the filing of the answer." *Duemer v. Edward T. Joyce & Associates, P.C.*, 2013 IL App (1st) 120687, ¶ 50. A party must object " 'at the earliest possible moment' to save the time and expense of a possibly unwarranted arbitration." *First Health Group Corp.,*393 Ill. App. 3d at 48 (quoting *Tri-City Jewish Center v. Blass Riddick Chilcote*, 159 Ill. App. 3d 436, 439 (1987)). "Through the operation of waiver, a party may become bound by an award that otherwise would be open to attack." *Village of Posen v. Illinois Fraternal Order of Police Labor Council,* 2014 IL App (1st) 133329, ¶ 32. If a party timely objects, the issue is preserved for judicial review, even if he or she participates in the subsequent arbitration proceedings. *First Health Group Corp.*, 393 Ill. App. 3d at 48-49.

¶ 29　　Initially, we note that the arbitrator, the trial court, the parties, and certain cases cited above use the word "waiver" rather than "forfeiture" when discussing whether a party properly preserves the issue of whether a claim is subject to arbitration. Although "waiver" and "forfeiture" are sometimes "used interchangeably," these words "have distinct meanings." *Pinske v. Allstate Property & Casualty Insurance* Co., 2015 IL App (1st) 150537, ¶ 18. " 'Waiver' means the 'voluntary relinquishment of a known right,' and 'forfeiture' means 'the failure to make the timely assertion of the right.' " *Id.* (quoting *People v. Blair*, 215 Ill.2d 427, 444 n. 2 (2005)). Forfeiture "applies when an issue is not raised in a timely manner." *Pennymac Corp. v. Jenkins*, 2018 IL App (1st) 171191, ¶ 21. The seventh circuit has explained that the right to arbitrate can be waived or forfeited and that, although previous cases discussing the "loss of a right to arbitrate" had considered whether "waiver" occurred, the concept "encompasses both intentional relinquishments and implicit abandonments of the right." *Smith v. GC Services Limited*

*Partnership*, 907 F.3d 495, 499 (7th Cir. 2018). Thus, here, because the issue is whether Tadros timely objected to the arbitration of the claims against him, forfeiture is the more appropriate term.[5]

¶ 30    We conclude that Tadros forfeited his objection to arbitration because he did not timely raise his objection. In March 2016, petitioners filed their original demand, in which they specifically named Tadros as a respondent and asserted allegations against him personally. For example, petitioners asserted that Watershed spent significant time and money negotiating contracts with Tadros and that, with respect to the Restaurant Projects, Tadros and Watershed entered a series of contracts, including the operating agreements. Petitioners alleged that Tadros breached his duties under the operating agreements when he used Watershed's confidential information to divert the Restaurant Projects into a new project and that he violated the fiduciary duties he owed to Watershed. After petitioners filed this original demand, he participated in the arbitration proceedings for about 15 months without objecting to arbitration.

¶ 31    Further, the record shows that, at the beginning of the arbitration proceedings and before Tadros filed his answer, Tadros was well aware of the arbitration provisions in the operating agreements, which provided that the AAA Rules would govern the agreements. In two letters from the AAA in April 2016, Tadros was informed that the matter was being administered under the AAA Rules, that the AAA Rules applied to the matter under section 12.13 of the parties' contracts, and that, following an administrative call, the parties had agreed to "mediation on a **parallel track to Arbitration**" under R-9 of AAA Rules. (Emphasis in original.) Then, in an April 25, 2016, letter to the AAA, Tadros disputed the location of the arbitration forum, as his counsel stated that

---

[5] As previously noted, the arbitrator, the trial court, the parties, and certain case law used the word "waiver." Thus, we will continue to use "waiver" when it is used by the arbitrator, the trial court, the parties, and the cases.

respondents "each dispute New York as the proper forum for the Arbitration." To support this argument, Tadros cited the operating agreements, stating that the agreements "clearly require" that the arbitration be held in Illinois. Thus, in April 2016, before Tadros filed his answer, he was not only aware of the arbitration provisions in the operating agreements, including that the AAA Rules applied to the matter, but also used them to support his argument regarding the proper location for the arbitration. Under Rule 7(c) of the AAA Rules, a party "must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement." However, when Tadros filed his answer in May 2016, he did not object to the arbitrability of the claims against him.

¶ 32    Moreover, after Tadros filed his answer, he continued to participate in the arbitration without objection and his conduct during the proceedings was consistent with agreeing to follow the arbitration provisions contained in the operating agreements. In a May 2016 letter addressed to the AAA, petitioners' counsel, on behalf of the parties, explained that the parties had "agreed to forego the requirement *under the operative arbitration agreement* to conduct the arbitration through party arbitration," that the parties had agreed that the arbitration would be conducted before a single arbitrator, and that the parties believed "this will expedite the prearbitration procedures and streamline the Arbitration itself." (Emphasis added.) Thereafter, in September 2016, Tadros's counsel served a request for documents under the AAA rules and specifically requested documents related to the fiduciary duties Tadros owed to Watershed and to "any breach by Tadros of the governing contracts." Thereafter, about seven months later in April 2017, the parties had produced 11,000 pages of documents and even requested to continue the hearing to August 2017 so they could complete discovery.

¶ 33    On August 8, 2017, about one week before the August 14, 2017, arbitration hearing began, Tadros objected to the arbitrability of the claims against him in his amended answer to petitioners' amended demand and in his pretrial memorandum on the basis that he was not a party to the arbitration agreements. However, Tadros's objection occurred about 15 months after he had actively participated in the arbitration process as described above and after he had filed his May 5, 2016, answer to petitioners' demand. Accordingly, given that petitioners asserted allegations against Tadros personally in their original demand and that Tadros actively participated in the process for over 15 months without objection, we cannot find that Tadros objected to the arbitrability of the claims against him in a timely manner. We therefore conclude that Tadros forfeited his objection. Thus, the trial court did not err when it agreed with the arbitrator that Tadros waived his objection to arbitration and when it found that Tadros waived his objection by "his willing submission to the arbitrator's jurisdiction."

¶ 34    We note that to support Tadros's argument that he did not waive his objection because he raised it before the arbitration hearing commenced, he cites *Village of Carpentersville v. Mayfair Construction Co.*, 100 Ill. App. 3d 128, 130 (1981). We find this case distinguishable. In *Village of Carpentersville*, about one year after petitioner filed a demand and respondent filed an answer and counterclaim, respondent entered a special and limited appearance in the arbitration proceedings objecting to the jurisdiction of the arbitrator. *Id.* at 130. Before the arbitration hearing commenced, respondent filed a declaratory judgment action in the circuit court alleging that various claims were not arbitrable. *Id.* The appellate court concluded that respondent did not waive his objection, stating "that the objections made prior to a hearing on the merits of the arbitration

proceeding was sufficient to preserve the issue" and that the "objection to arbitrability was timely made by bringing this action prior to a hearing on the merits before the arbitrator." *Id.* at 130-31.

¶ 35    Here, unlike the respondent in *Village of Carpentersville* who filed a declaratory judgment action in the circuit court before the arbitration hearing commenced, Tadros did not file any action in the circuit court objecting to arbitrability. Further, unlike respondent's activities in *Village of Carpentersville*, Tadros did more than file an answer and counterclaim during the arbitration process. Rather, as previously discussed, he actively participated in the arbitration proceedings for over 15 months without objection and his actions during the process were consistent with agreeing to follow the arbitration provisions in the operating agreements. Thus, *Village of Carpentersville* is distinguishable, and we are unpersuaded by Tadros's reliance on it.

¶ 36    We also note that to support Tadros's argument that he did not waive his challenge to arbitration because he raised an objection before the arbitration hearing began, he cites *Tri-City Jewish Center v. Blass Riddick Chilcote,* 159 Ill. App. 3d 436 (1987). There, the court found that the plaintiff waived his challenge to arbitrability because he raised the issue after the arbitrator entered the award. *Id.* at 439. The court stated:  "We deem the issue waived inasmuch as it has been raised subsequent to the rendition of the arbitration award." *Id.* In its analysis, the court noted that the plaintiff had two years within which he could have raised the issue of arbitrability of the claim, as the defendant's demand for arbitration was made in December 1983 and the arbitration hearings were held in November 1985. *Id.*

¶ 37    We are unpersuaded by Tadros's reliance on *Tri-City*. Although the court there concluded that the defendant waived his objection because he raised the issue after the arbitration award was entered, the court did not hold that when a party raises an objection to arbitrability before an

arbitration hearing begins then the party necessarily preserves the issue for review. Rather, the court also stated that "[t]he issue of whether or not there is any jurisdiction to arbitrate or the limits of that jurisdiction should be determined at the earliest possible moment" and "[a]ny issue regarding the nonarbitrability of the dispute is waived by participation in the arbitration proceedings." *Id.* at 439. Moreover, unlike *Tri-City*, where the facts only showed that plaintiff filed a counterclaim during the arbitration proceedings, here, Tadros actively participated in the arbitration process for 15 months and his actions were consistent with agreeing to follow the arbitration provisions.

¶ 38     Nevertheless, even if we would find that Tadros did not forfeit his argument as to whether he was bound by the arbitration provisions, we would find that he agreed to allow the arbitrator to decide that issue and that under the deferential standard of review with which we would review that finding, we would affirm.

¶ 39                         B. Arbitration Agreements and Tadros

¶ 40     Tadros contends that the trial court erred in enforcing the arbitration provisions contained in the operating agreements against him because he was not a party to the agreements, as he signed them in his corporate representative capacity and not as an individual. Tadros asserts that under Illinois law he could not be compelled to arbitrate because he was as a nonparty to the arbitration agreements.

¶ 41     Initially, we note that if the parties submit the question of arbitrability to arbitration, the court must defer to the arbitrator's decision. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Under this deferential standard, the court applies the same standard as they would apply "when they review any other matter that the parties have agreed to arbitrate." *Salsitz v.*

*Kreiss*, 198 Ill. 2d 1, 14 (2001). When deciding whether a party has agreed that an arbitrator should decide arbitrability, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc.*, 514 U.S. at 944 (quoting A*T & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)).

¶ 42    Here, the record shows that there is clear and unmistakable evidence that the parties agreed to submit the question of arbitrability to the arbitrator. As previously discussed, Tadros actively participated in the arbitration under the AAA Rules for 15 months without objecting to the arbitrability of the claims against him. Further, when Tadros did object about one week before the hearing, he did not question the arbitrator's authority or argue that the arbitrator did not have authority to determine the arbitrability of the claims. Rather, he asserted that the claims against him were not arbitrable because he was not a party to the agreements, that he was "not individually liable," and that "no award" could be made against him. Then, at the hearing during Tadros's opening statement, his counsel asserted that because he was not a party to the operating agreements, he did not "think they can receive an award *** or that claimants can obtain an award against them." Following the hearing, Tadros also did not question the arbitrator's authority or argue that the arbitrator did not have authority to decide the issue of arbitrability. Rather, in his written closing argument, he asserted that he could not "be subject to the arbitration provision" and should be dismissed as a party. In fact, in Tadros's supplemental closing brief argument regarding the issue of whether the Federal Arbitration Act or the Illinois Uniform Arbitration Act applied to whether Tadros waived his objection to arbitrability, Tadros actually acknowledged that he submitted the question of arbitrability to the arbitrator, as he asserted that *"[r]espondents have*

*submitted the issue of the existence of an arbitration agreement to the arbitrator*" and "[i]t is Claimants who are arguing that the Respondents should have had a court resolve whether Tadros, B Box and Shytown were parties to a valid arbitration agreement." (Emphasis added.) Respondents also asserted in that brief that "the cases cited by [petitioners] actually support what the *Respondents did in this case; have the arbitrator decide the issue of arbitrability of the claims against Tadros*, B Box and Shytown." (Emphasis added.)

¶ 43    Accordingly, given Tadros's active participation in the arbitration for 15 months and that he never questioned the arbitrator's authority to resolve the dispute about whether the claims against him were arbitrable, we find that Tadros submitted the question of arbitrability to the arbitrator. See *Jones Dairy Farm v. Local No. P-1236, United Food & Commercial Workers International Union, AFL-CIO*, 760 F.2d 173, 176 (7th Cir. 1985) (where the respondent argued that the arbitrator did not have authority to interpret a clause in the parties' agreement, the seventh circuit affirmed the award, noting that the respondent never questioned the arbitrator's authority and stating that "[b]y going forward with the arbitration without questioning the arbitrator's authority to resolve the dispute, [respondent] consented to have him decide" the issue). Accordingly, because Tadros submitted the question of arbitrability to the arbitrator, we will defer to the arbitrator's decision regarding the arbitrability of the claims against him. See *Anderson v. Golf Mill Ford, Inc.*, 383 Ill. App. 3d 474, 478 (2008) (affirming the arbitrator's award regarding arbitrability and stating that "where the parties agree to submit the question of arbitrability itself to arbitration, the court should review the decision deferentially").

¶ 44    As previously discussed in paragraph 41, the deferential standard of review is the same standard to apply when reviewing other matters that the parties agreed to arbitrate. Thus, "the court

should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *First Options of Chicago, Inc.*, 514 U.S. at 943. We start with the presumption that the trial court did not exceed its authority. *Herricane Graphics, Inc. v. Blinderman Const. Co.*, 354 Ill. App. 3d 151, 155 (2004). When possible, we must "construe arbitration awards so as to uphold their validity." *Salsitz*, 198 Ill. 2d at 13. A court will not reverse an arbitrator's award "on the ground that it is illogical or inconsistent" or if contains "errors in judgment or a mistake of law or fact." *Herricane Graphics, Inc.*, 354 Ill. App. 3d at 156. In fact, a court will only grant a petition to vacate an arbitration award in "extraordinary circumstances." *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 564 (2005). It is the burden of the person challenging the award to prove by clear and convincing evidence that it was improper. *Galasso v. KNS Companies, Inc.*, 364 Ill. App. 3d 124, 131 (2006).

¶ 45 To determine "whether parties agreed to arbitrate a certain matter, courts should apply ordinary state-law principles governing the formation of contracts." *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 511 (2004). It is well-settled that " '[a] nonparty to an arbitration agreement can neither compel arbitration nor be compelled to arbitrate.' " *Trover v. 419 OCR, Inc.*, 397 Ill. App. 3d 403, 407 (2010) (quoting *Jacob v. C & M Video, Inc.,* 248 Ill. App. 3d 654, 659 (1993)).

¶ 46 When an agent executes a contract on behalf of the principal and the other party is aware of the agency relationship, the agent is not individually bound by the terms of a contract, unless he agrees to be personally liable. *Western Casualty & Surety Co. v. Bauman Insurance Agency, Inc.*, 81 Ill. App. 3d 485, 486 (1980). However, when the language in the document conflicts with the apparent representation by the agent's signature, there is a question of fact as to the agent's intent, which is sufficient to withstand a motion to dismiss. *Knightsbridge Realty Partners, Ltd.-75 v.*

*Pace,* 101 Ill. App. 3d 49, 53 (1981) "An agent may expressly agree to be personally bound, or it may be inferred by implication reasonably drawn from all the facts and circumstances in evidence." *Western Casualty & Surety*, 81 Ill. App. 3d at 486.

¶ 47    Here, the operating agreements contain arbitration provisions stating that "the parties agree that any disputes which may arise out of or in connection with this Agreement shall be decided by" the AAA Rules.  Tadros signed the operating agreements and, next to his signature, indicated that his title was "President" of Crown such that he was signing in a representative capacity. However, the arbitrator, who presided over the hearing and heard the evidence, found that the operating agreements showed that the parties intended to bind not only the signatories, but also the managers, which included Tadros. In the arbitrator's order, she stated that the agreements "apply to the claims alleged in this matter, all of which arose in connection with the Operating Agreements, which are the 'joint venture vehicle[s]… for purposes of the [Restaurant Projects].'" From our review of the record, we cannot find the arbitrator's conclusion that the parties intended Tadros to be personally bound by the operating agreements and arbitration clauses therein was so improper that we must vacate the award.

¶ 48    As previously discussed, petitioners asserted claims against Tadros personally in their original demand filed with the AAA, including allegations against Tadros related to the operating agreements. However, in Tadros's answer, he did not object to arbitrability of the claims against him. Instead, as previously discussed, he participated in the arbitration proceedings for about 15 months. During the process, Tadros even cited the operating agreements when he argued that Illinois, not New York, was the proper forum, lending support to the conclusion that Tadros understood that the parties had intended him to be bound by the agreements. Accordingly, Tadros's

conduct during the arbitration proceedings supports the arbitrator's decision that the parties had intended, and understood, that the operating agreements bound Tadros personally.

¶ 49    Further, the arbitrator expressly found that the operating agreements imposed certain duties on Tadros as a manager. The record shows that in section three of each operating agreement, it provided that "each Manager appointed by a Member shall use his powers to procure that such Member," *inter alia*, "act towards the other in all matters relating to this Agreement and the Company with the utmost good faith," "promote the best interest of the Company to realize the maximation of long-term benefits of the Members with respect to their interest in the Company," and "not intentionally take any action that could reasonably be expected to prejudice the Company or the other Member." In addition, section 3.5(b) of each agreement stated that managers "shall not permit to be diverted to any other Person sources of revenue properly belong to the Company." Thus, based on the provisions in the operating agreements, the arbitrator could have reasonably inferred and concluded that Tadros had certain obligations under the agreements and that the parties had intended for him to be personally bound by them.

¶ 50    Accordingly, from our review of the record, we cannot find that it was so improper for the arbitrator to conclude that it had jurisdiction to review the claims against Tadros because the parties intended the operating agreements and arbitration provisions contained therein to bind him personally. Thus, we are unpersuaded by Tadros's argument that the trial court erred when it enforced the arbitration provisions against him.

¶ 51    We note that Tadros asserts that the arbitrator exceeded her authority when she determined that he was bound by the arbitration clauses because contract formation is an issue for the courts to decide. However, as previously discussed, Tadros submitted the issue of arbitrability of the

claims against Tadros, and thus the issue whether Tadros was party to a valid arbitration agreement, to the arbitrator. See *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 738 (7th Cir. 2010) ("the existence of a contract is an issue that the courts must decide prior to staying an action and ordering arbitration, unless the parties have committed even that gateway issue to the arbitrators."). Thus, we are unpersuaded by Tadros's argument.

¶ 52                                                  C. Lost Profits

¶ 53    Finally, Tadros argues that the trial court erred when it found that the arbitrator had authority to award lost profits of Shytown B Box (one of the restaurants) to B Box 1 Management against Tadros. Tadros argues that Shytown B Box and Tadros were not parties to the operating agreement subject to the arbitration provision. He argues therefore that the arbitrator decided a dispute outside the scope of the arbitration agreement when it awarded lost profits to B Box 1 Management against Tadros, as it determined the rights of two nonparties (Tadros and Shytown B Box). Tadros also asserts that lost profits belong to the company, not its members, and that the lost profits awarded to B Box 1 Management, was a right and claim of Shytown B Box, the company formed under the operating agreement.

¶ 54    Here, the trial court concluded that under the parties' arbitration provisions they "specifically empowered an arbitrator to decide" the lost profits issue. The court concluded that even though Tadros disagreed with the arbitrator's finding, he could not argue that the arbitrator did not have authority. In the court's reasoning, it cited in *re Marriage of Haleas*, 2017 IL App (2d) 160799 ¶ 79, which states "when parties agree to submit a dispute to binding arbitration, they bargain for finality." The court therefore concluded that it would not disturb the arbitrator's award.

¶ 55    Initially, we note that Tadros forfeited his argument that the arbitrator did not have jurisdiction over petitioners' claims for lost profits against Tadros. In Tadros's affirmative defenses to the amended demand for arbitration, he asserted that petitioners sought damages that "belong[ed] to the limited liability and not to [petitioners] in their individual capacity." In his pretrial memorandum, he asserted that petitioners (Shytown 168 and B Box 1 Management) could not receive lost profits individually because they did not assert a derivative claim. However, Tadros did not argue that the arbitrator did not have authority to determine petitioners' claim for lost profits against Tadros. Thus, Tadros did not properly preserve his argument that the arbitrator did not have authority to review petitioners' claim for lost profits against Tadros because Tadros and Shytown B Box were not parties to the arbitration agreements. See *First Health Group Corp.*, 393 Ill. App. 3d at 52 ("Failure to raise a timely objection results in the waiver of even a legitimate claim.").

¶ 56    Even if we would find that Tadros did not forfeit his argument, we would not find that the court erred in concluding that the arbitrator had jurisdiction over petitioners' lost profits claims. The arbitrator concluded that Tadros and the Restaurant LLCs (Shytown B Box 1 and Shytown LLC) were parties to the operating agreements and arbitration provisions contained therein. As previously discussed, we cannot find that this conclusion was improper. Thus, the trial court did not err when it determined that the arbitrator had jurisdiction to award Shytown B Box 1's lost profits to Watershed because the parties had agreed to submit the issue to arbitration in the operating agreements.

¶ 57                                    IV. Conclusion

¶ 58    For the foregoing reasons, the judgment of the circuit court is affirmed

¶ 59    Affirmed.